WILKS P. KRETSCHMAR, RECEIVER, *v.* FIRST NATIONAL BANK OF GREENVILLE.

[43 South., 474.]

ASSIGNMENTS FOR BENEFIT OF CREDITORS. *Secured creditor. Distribution.*

A non-preferential assignment for the benefit of creditors must be treated as providing for payment of liabilities ratably, and a creditor who holds collateral security for his debt is not entitled thereunder to dividends on the face of his claims without crediting the value of the collaterals.

FROM the chancery court of Washington county.

HON. PERCY BELL, Chancellor.

Kretschmar, receiver of the Merchants & Planters Bank of Greenville, appellant, was complainant in the court below; the First National Bank of Greenville, appellee, was defendant there. From a decree in favor of the defendant the complainant appealed to the supreme court.

In June, 1905, the Merchants & Planters Bank of Greenville, being insolvent, made a general assignment of all of its property, without preference, in accordance with Code 1892, ch. 8, for the benefit of creditors. Among other debts it owed the appellee, the First National Bank of Greenville, $10,979.44, which was partially secured by collateral. This collateral, amounting to $5,603.15, was duly collected by the appellee and applied to its debt, reducing the same to $5,376.29, unsecured. Kretschmar, the appellant, in February, 1906, made a twenty per cent pro rata dividend payment on the debts of the bank, by order of the chancery court, calculating the twenty per cent, in the case of appellee's debt, upon the original $10,979.44 instead of on the unsecured balance of $5,376.29.

In January, 1907, the receiver, Kretschmar, reported that he had on hand for further distribution to creditors additional

funds sufficient to make another twenty per cent pro rata dividend payment. The report stated further "that the First National Bank of Greenville has collected all the collateral held by it to secure the debt of $10,979.44 owing to it by the Merchants & Planters Bank on June 9, 1905, said collateral amounting to $5,603.15, leaving a balance of $5,376.29; and said First National Bank is entitled to a pro rata dividend to the amount of twenty per cent on the said balance of $5,376.29, which amounts to $1,075.26, deducting however therefrom such sum as was previously paid to the said First National Bank in the first twenty per cent pro rata dividend payment heretofore made in February, 1906, over and above said sum of $1,075.26. The amount overpaid to said First National Bank on said first dividend in 1906, was $1,120.63; *i. e.,* said receiver not only paid said First National Bank the amount due on said twenty per cent, to-wit, $1,075.26, but in addition thereto paid $1,120.63. Hence the receiver should now deduct from said sum of $1,120.63 the sum of $1,075.26, which will leave the said First National Bank indebted to the receiver in the sum of ,$45.37." The appellee's contention was that the collection by it of the aforesaid collateral in no way affected its right as a creditor to receive twenty per cent dividend based upon the original debt as it existed before being reduced by collection and application thereon of the said collateral.

The opinion of the learned chancellor in the matter is reported in full and is as follows:—

"This matter was brought before the court for decision upon the proper method of distribution of dividends arising from a collection of assets of an insolvent bank to secure creditors.

It may be broadly stated in the beginning, that there are two views entertained by the courts upon this subject and two rules have been enunciated which for the sake of brevity, will hereafter be designated as the United States rule and the Mississippi rule.

The United States rule declares that the dividend shall be paid to secured creditors upon the basis of the debt owing at the time or date of the insolvency, regardless of the collateral security held or collected by the creditor, with a provision that in no case should more than the debt be paid, and that all dividends or securities above the amount of the debt should be returned to the receiver.

The Mississippi rule is as announced in *Duncan* v. *The Bank,* 84 Miss., 467, that dividends shall only be paid to the creditor after he shall have credited the indebtedness with the value of the securities held by him.

The United States rule is followed by Connecticut, Illinois, Kentucky, Michigan, Nebraska, New Hampshire, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Vermont, Wisconsin and England.

The Mississippi rule is followed by Iowa, Kansas, Maryland, Massachusetts, New Jersey, Ohio, Tennessee and Washington.

With all deference to the learned chief justice who enunciated the Mississippi rule, and still ornaments the supreme bench, after careful and exhaustive investigation I am constrained to differ from the views enunciated by him, and to the end that the supreme court may again consider the matter in the light of the authorities which incline to the opposite view and of the experience of this court in the conduct of the affairs of insolvent banks, this decision is made and the case submitted for reconsideration by our court of last resort.

The United States rule, as enunciated in *Merrill* v. *Bank,* 173 U. S., 131, 19 Sup. Ct., 360, 43 L. Ed., 640, supports the finding of the lower court and exhaustively considers the subject.

The dissenting opinion in that case which was adopted by the Mississippi court, is in the opinion of this court, based upon a misconception and is fallacious.

There have been two rules followed by the courts in the mat-

ter of distribution of assets of insolvent estates, as given above; the United States rule being also. called and known as the chancery rule, while the Mississippi rule is known as the Bankruptcy rule.

I think it will be found that the Bankruptcy rule, when followed, is usually based upon some statutory enactment prescribing that method of distribution. It is so in the cases which I have read, with but few exceptions, and these exceptions follow the courts which were led in their decisions by a statute.

Our only statutory requirement is that the distribution shall be made ratably, which I submit, is done under the United States rule.

In the various discussions of the subject, which have marked the progress through the courts, the end and aim of the courts appear to have been to follow that method of distribution which, in their opinion, would be the most equitable. Hence, Judge TAFT announces, in the case of *Armstrong* v. *Chemical Bank,* one of the most clearly reasoned and cogently expressed opinions, which the court has read, that there have been four rules suggested to govern distributions; rule 1 being the Mississippi rule, or Bankruptcy rule; rule 2 being the United States rule, with the modification that the creditor secured shall prove his debt, crediting the securities as collected and receiving the dividends on balance due. Rule 3 is a modification of rule 2, requiring creditors to prove for debt less the payments prior to probate. Rule 2 is rejected by all authorities, as it virtually denies the vested right of the creditor in the funds to be distributed. Rule 3 is so slightly followed as to be negligible. Rule 4 is the United States rule, or equitable rule.

The reasoning upon which the United States rule is based, is that the debt owing by the creditor is a debt regardless of the security, and in the absence of a statutory enactment directing otherwise, will be considered so far as dividends are concerned as though it were unsecured.

That this rule is reasonable and just is apparent, for the

creditor before the insolvency had the right to proceed to the collection of his debt regardless of the security. He could credit it the debt therewith and sue for the balance or he could disregard the security and sue for the entire debt, and surely no court would endeavor to force him before obtaining judgment on his debt to credit it with the value of the security. To be sure, he would be obliged to return to the debtor the security when the debt was paid, but not until then. Should the fact of the insolvency of the debtor alter the rights and remedies of the creditor? Would his death do so? Certainly not. The confusion that has arisen and has clouded the decisions following the Mississippi or Bankruptcy rule has been based on the failure to distinguish between the debt itself and the right to share in the fund for distribution.

At the date of the insolvency the debtor owes the debt. The debt is then provable, and the subsequent dividends thereon do not reduce the amount of the base upon which the calculations for other dividends are made. The debt until paid exists, and securities cannot, and do not, affect it, until it is paid. The creditor has a vested right in the funds of the estate for distribution which is entirely different from his debt and the Mississippi rule, by obliging him to credit his debt with the "value" of the securities destroys his right.

If his debt is for $10,000 and his securities amount to $5,000, then under the Mississippi rule his debt is reduced to $5,000. If the total indebtedness of the debtor at the time of insolvency was $5,000 then the creditor has a vested right to twenty per cent of the general assets; under the Mississippi rule his right is cut in half, and reduced to ten per cent. What justification is there for his deprivation by a chancery court, in the absence of express statutory enactment? It is certainly impossible to claim that this is equitable.

Another source of confusion has arisen and it has been urged that in the event of a creditor for $10,000 with $5,000 collateral, and the collection thereof, as well as fifty per cent divi-

dend, would be paid in full, whereas an unsecured creditor for $5,000 would be paid only $2,500, which say the courts holding to the Mississippi rule is unjust and inequitable, for the reason that the first creditor is unsecured for $5,000 of his debt as is the second creditor and by reason of having security is paid in full, to the damage of the second creditor. The fault here is that the court errs in supposing that the $5,000 of security secured one-half of the debt. It is security for all of the debt, and he is not an unsecured creditor for any sum at all. The two creditors cannot be compared, for they are not in the same class. And in addition to his security, the first creditor has a vested right (and here is the crux of the situation) in the general assets of the debtor. He has a right against the general assets of the debtor prior to insolvency. How in the absence of a statute does he lose this right, and how can a court of equity deprive him thereof, to the benefit of the unsecured creditors? If he had such a right as to be warranted in disregarding the collateral and bringing suit, and levying on the general assets of the creditor, how does he lose this right? It is emphatically denied in *Kelleck's case,* handed down by the parent of our chancery courts, that he cannot be so deprived, and that the insolvency *per se* cannot alter the contractual relations previously existing.

I submit that the dissenting opinion in the *Merrill case, supra,* is based on such a statute, as disclosed by a careful reading thereof, and we in Mississippi have not such a statute. The acts of Congress, which governed the minority of the United States supreme court, can have no bearing in Mississippi.

It is claimed by our court in the *Duncan case,* that the basis of the Mississippi rule is the equity rule that a creditor having two funds upon which to rely (here his collateral and the general assets), must first have recourse to that fund to which other creditors, who have but one fund upon which to rely, have no access. This rule is primary and might apply here but for the

modification which Story lays down in secs. 560, 564 and 633 of his work on Equity, and which Pomeroy enunciates in sec. 1414, and note 6 thereto, of vol. 4 of the 2d edition of his classic work, and which his son states in sec. 866 of vol. 6 of the same work, to the effect that the creditor having recourse to two funds must not be forced to apply to one of them and exhaust it where he will be made to suffer thereby and by reason of the failure of another to take security. In the case cited above the secured creditor would lose by such action $2,-500. Also do the above great authorities announce that in all events the debt must be paid. These authorities it appears to me to dispose of the position heretofore assumed by our supreme court.

Surely a general equity court, without statute, save that directing the ratable distribution of assets, must follow the general rule as enunciated and followed by Story, Pomeroy and the various courts and authorities mentioned in "Cyc.," p. 571 of vol. 5; and in Am. & Eng. Ency. of Law, 2d ed., vol. 23, p. 1118, and vol. 3, p. 141; and by the great weight of authority in the world governed by English law, the exceptions being as I have stated those where a statute governed, or the lead of such a statute-guided court was followed.

I ask the court to read again and most carefully the authorities cited in the *Duncan case*. Not that I wish to be misunderstood as insinuating that the court does not read authorities, but that some time having elapsed since the rendition of that opinion, that matter is not fresh in the minds of a court with so heavy a burden to bear as ours.

Especially do I think the opinion in 28 L. R. A., p. 231, very able and convincing.

Again under the Mississippi statute these matters are placed in the chancery court for adjustment and I can see that therein the Chancery and not the Bankrupt rule should govern. A "ratable distribution" is not gained by the Mississippi rule, which is inequitable in its effect, as depriving the secured cred-

90 Miss.—24

itor of his vested rights, and of giving him less than his ratable share of the general assets.

Also it is impossible under the Mississippi rule for the secured creditor whose security does not pay him in full, to ever collect all of his debts. And this the writer says is imperative.

I wish furthermore to point out to the court, certain facts for this unconscionably long opinion. I beg their indulgence, pleading my interest in the matter and the wrongs I have seen attempted under the Mississippi rule, which could not have been performed under the United States rule, and the fact that I have wished this matter sent up that the possibility of fraud might be removed from future matters of this kind. I have had some six banks thrown into my court and have worked day and night endeavoring to bring order out of chaos, and also to have punished the persons who were responsible for the failure. In one, the first one, the present case, there was a large amount (over $100,000) of securities out. It was only by the most severe exertions and the assurance that the distribution would be made on the United States rule, that these secured banks held the security, and, with the aid of my receiver, collected their debts. This was the case with virtually all of them. There was no sacrifice of the securities, and there was a saving thereby of many thousands of dollars to the depositors. The result has been a payment of forty per cent to them. And I again ask the indulgence of the court, for this is not theory but solid facts which I am stating. In the case of the Bolivar County Bank there was a different disposition, the rule enunciated in the *Duncan case* was considered by creditors in all of its bearings and one of the creditors in one of the matters (and this case will also come before this court on my refusal to allow it to account), sold its collateral at public outcry, having given notice to the receiver and the public. The receiver had no funds to buy the security, and so at this sale this creditor bought in for itself, collateral to the value on its face of over $12,000, for $55 (thus securing a $5,000 note) and other collateral of the

face value of over $15,000 for $2,424, less certain payments, or including such. In other words, collateral to face value of something like $27,000, securing only $20,000, was sold publicly and bought in by the holder for really only a bit over $1,000. Now suppose they endeavor to collect (as they are doing), and such should be allowed even a ten per cent dividend on the balance of the debt with interest, amounting now to $20,000, they would collect the $27,000 collateral and $2,000 under the Mississippi rule, and obtain $28,000 for a debt of $20,000, surely this is not equity, delighting in equity, nor should equity afford opportunity for such a scene nor the necessity for litigation over it. The Mississippi rule opens wide the door for fraud, virtually forces it, for it compels a sacrifice or sale or realization upon the securities, before dividends will be allowed, and then a sharing in dividends. Whereas the Chancery rule encourages a conservation of the collateral and in no case can one collect more than his debt. The worst contingency contemplated by the minority in the *Merrill case* was the payment in full of secured creditors, to the injury of the unsecured. But under this rule and that of Mississippi, the secured creditors cannot obtain more than their debt. The United States rule is a benefit as it saves and secures assets and thus all creditors benefit. Otherwise there is fraud, or vast or expensive litigation.

I ask the court to consider the possibilities of the practical effects of their rule in the light of my actual experience. This litigation could be avoided, fraud eliminated, assets preserved and depositors saved money, as it was in this case by observing the Chancery rule and not the Bankruptcy rule. The theory of the court was good as a theory, but it unfortunately did not consider human nature in connection therewith, nor the fact that generally speaking, men will take advantage of every opportunity to enrich themselves at the expense of others and that law which has reason on its side and also makes it to men's

interest to be honest and careful of the interest of all is a good law.

Under the Chancery rule there is some check on secured creditors, but under that of bankruptcy none.

It is a matter of business and I am dealing only in facts, those facts which have caused me to reach the conclusion after hard and conscientious study that the Equity rule is the proper rule, in the absence of statute. Also is there not some consideration to be given the idea that to the diligent who secure a security either total or partial equity will extend favor and that they are, apart from other consideration, entitled to the fruit of their forethought and diligence?

Again I call attention to the fact that before insolvency there were four courses open to a debtor. 1. He might pay part of his debt and let the collateral pay the balance. 2. He could pay all and receive the collateral. 3. The collateral could be collected and pay the debt. 4. The collateral could pay part of the debt and suit could be brought for the balance. In all of these it will be seen that the creditor is entitled to his debt and all of it, that the collateral need not be regarded. How can and why should insolvency alter these contractual relations and vested rights? The debt and the right to a share in general assets are totally different and unaffected by collateral.

I think, after all my experience with these matters, that the better rule would be that the dividends must be declared on the debt due at the date of the insolvency, that all collateral must be collected in full and credited to the debt or turned back to the receiver. Permitting a sale or compromise of the collateral, save under orders and approval of the court, opens wide the door to fraud.

I am convinced that the desire of the supreme court of Mississippi is solely to announce the law as it is, and, where there is a doubt, to follow the line of authorities wherein dwelleth right. I also feel equally sure and confident that the present rule opens wide the door to fraud, encouraging tricky deal-

ings, and necessitating litigation. For these reasons, I wish the matter again submitted that the supreme court may look carefully into the case, and eliminate future fraudulent dealings of secured creditors, who fear the workings of the Mississippi rule. For the reason that I respectfully differ with the former finding, I ask another ruling.

PERCY BELL, Chancellor."

*Shields & Boddie,* for the appellants.

The learned chancellor in the court below, allowed the appellee, the First National Bank, to share in the two distributions of the dividends, in accordance with the rule declared by the supreme court of the United States; that is, allowed the appellee to receive dividends upon the entire amount of the indebtedness due to it by the insolvent Merchants & Planters Bank, at the time of the assignment.

This court, however, in the case of *Union & Planters' Bank v. Duncan,* 84 Miss., 467, has adopted the rule here contended for by appellant, that the value of the collateral collected by the appellee, should be deducted from the original debt due to it, and dividends be distributed upon the balance.

We submit, that under the rule in the case cited, the decree of the lower court should be reversed, in order that a proper decree may be rendered below, in accordance with such view.

*LeRoy Percy,* for appellee.

The principles upon which the decree in this case was rendered, are clearly set forth in the opinion of the learned chancellor below. That these principles work for equity and righteousness, is forcefully shown by the statement of the chancellor's own experience. I feel that I can add nothing, and I accordingly refer to it, as upholding the contentions of the appellee.

Argued orally by *LeRoy Percy,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

After the most careful consideration we adhere to the view

announced in *Union & Planters' Bank* v. *Duncan,* 84 Miss., 467, 36 South., 690. The equitable rule was first authoritatively announced in England in 1868 by Lord KELLOCK. This equitable rule was expressly abrogated by the British Parliament about 1873, by the Judicative act of August 5, 1875, and the amendment of August 11, 1875. If, therefore, this court were to adopt and persist in that so-called equitable rule, it would be itself in the attitude of following a rule of distribution expressly abrogated in England, whence the doctrine originally came to us, through Lord KELLOCK. This would be a most anomalous condition.

Two other observations occur: (1) That an assignment without preferences is practically the same as an assignment with the word "ratable" in it; and (2) that if the view urged with such marked ability by the counsel who argued this case orally, attempting to show that in any event a different view from the one announced in the *Duncan case* should prevail in the case of assignments which are administered under our statute in the chancery court, should be upheld, then we would have the singular condition of having three rules for distribution; the two between which the courts have been so divided—the Bankruptcy rule and the Equity rule—and the third, to-wit, a rule to be adopted in cases where assignments have been made in this state. It seems to us, after mature deliberation, that this would increase, instead of lessen, the confusion.

*The decree is reversed, and the cause remanded for a decree in accordance with this opinion.*

CALHOON, J., dissents.